

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER T. COURTIOL, on behalf of himself and all others similarly situated, | : |
| Plaintiff, | : |
| v. | : |
| PARNON ENERGY INC., ARCADIA PETROLEUM LTD, ARCADIA ENERGY (SUISSE) SA, NICHOLAS J. WILDGOOSE, JAMES T. DYER and JOHN DOES 1-10 | : |
| Defendants. | : |

**CLASS ACTION COMPAINT**

**JURY TRIAL DEMANDED**



RECEIVED
JUN 23 2011
U.S.D.C. S.D. N.Y.
CASHIERS

## CLASS ACTION COMPLAINT

Plaintiff Christopher T. Courtiol ("Plaintiff"), individually and on behalf of the Class defined below, brings this action on behalf of himself and all similarly situated individuals and entities and alleges, based upon his own knowledge and the investigation of his counsel and on information and belief:

### SUMMARY OF ALLEGATIONS

1.    Background. (a) The New York Mercantile Exchange ("NYMEX"), is located in this District, and has created and conducted trading in commodity futures contracts, including West Texas Intermediate ("WTI") light sweet crude oil futures contracts ("NYMEX WTI crude oil futures").

(b)    The NYMEX WTI crude oil futures contract is the world's largest volume futures contract trading on a physical commodity and was used by Plaintiff and persons throughout the United States.

(c)    The price signals sent by NYMEX WTI crude oil futures trading are used to price and allocate oil and its refined products, including gasoline, among consumers and others. These price decisions are very important to the economy and the economic health of individual citizens.

(d)     Provided that these signals are the result of non-manipulated NYMEX WTI crude oil futures prices, prevailing economic theory holds that such signals will value, allocate and ration these energy resources more efficiently than centralized planners in a command economy.

2.     Manipulation. However, between at least late 2007 and April 2008 ("Class Period"), the Defendants intentionally manipulated the prices of NYMEX WTI crude oil futures contracts in violation of Section 9(a) of the Commodity Exchange Act ("CEA"), as amended, 7 U.S.C. §13.

3.     Means. (a) Defendants' manipulation of NYMEX WTI crude oil futures was implemented through diverse, unlawful means. For example, Defendants committed an overall "rolling" manipulation which consisted of multiple unlawful manipulations.

(b)     In January, again in March, and in April 2008, Defendants repeatedly first engaged in a manipulation upward of NYMEX WTI crude oil futures prices and WTI physical crude oil prices.

(c)     Then, in January and March 2008, Defendants repeatedly engaged in a manipulation downward of NYMEX WTI crude oil futures prices and WTI physical crude oil prices.

(d)     The April manipulation and Defendants' overall manipulation was blunted in late April 2008 by the intervention of the Commodity Futures Trading Commission ("CFTC"). Thereafter, the price artificiality in NYMEX WTI crude oil futures contract began to subside after the times in May 2008 when Defendants sold out their large holdings of WTI physical crude oil.

4.     Summary of Defendants Overall Manipulation. As is alleged in detail in ¶¶45-56 below, Defendants' overall manipulation included at least the following:

A.     Defendants intentionally purchased so-called "long spread positions" in NYMEX WTI and other crude oil futures contracts expiring in the then-current month and the following month.  These "long" positions would profit if prices and spreads increased to levels above what Defendants paid to purchase them. Such increases were very likely to occur if market participants perceived that the available WTI crude oil supplies were declining to low levels.

B.      Just as they were completing their purchases of long spread positions in NYMEX and other crude oil futures, Defendants triggered "phase 2" of their manipulation. They intentionally began to purchase large amounts of WTI physical crude oil. Defendants' holdings of WTI crude oil dominated and controlled WTI physical crude oil supplies and prices. But Defendants had no commercial need for such crude oil.

C.      Defendants then took un-commercial steps with the dominant position in physical WTI crude oil that they had acquired.  These steps falsely signaled to market participants that the WTI crude oil supplies were rapidly being committed to commercial needs and that the available WTI crude oil supplies were declining rapidly to very low levels.  Again, Defendants had no commercial needs for the large WTI crude oil supplies that they had hoarded and engrossed.  These false price signals further artificially inflated both WTI crude oil prices and NYMEX WTI crude oil futures contracts prices.

D.      At the artificially inflated prices caused by the above-mentioned manipulative steps, Defendants then sold out their long spread positions and sold new so-called "short positions" in NYMEX and other crude oil futures contracts expiring in later months.  These "short" positions would profit from declines in prices to levels below what Defendants received on their sales.  Declines in prices were very likely to occur if market participants perceived that WTI crude oil supplies were significantly increasing to higher levels.

E.      After completing their selling of the deferred NYMEX futures contracts, Defendants then dumped their unneeded large WTI physical crude oil on the market, as they had intentionally planned to do all along.  This directly greatly increased supplies and also reduced prices of WTI physical oil which in turn caused declines in NYMEX WTI crude oil futures contracts that greatly profited Defendants' deferred month short positions.

F.      Defendants' final steps alleged in "D" and "E." above did not occur to the same extent or at all in the April 2008 sequence of their manipulation because the intervention by the CFTC caused Defendants to diversify their behavior to try to make it seem less illegitimate.

3

5.    Effects. (a) Through the multiple rolling manipulations making up Defendants' overall manipulation, Defendants intentionally and directly (1) caused the level of prices of NYMEX WTI crude oil futures contracts and WTI physical crude oil to be artificial, and (2) twisted the "spreads" which caused further price artificiality in NYMEX WTI crude oil futures prices during the Class Period. NYMEX conducts trading in one WTI crude oil future contract for each month of the current year and the next four years, and a contract for each June and December of the years from six to nine years in the future. The "spreads" are the differences between prices of the NYMEX WTI crude oil futures contracts expiring in different months.

(b)    The prices of WTI crude oil were used by market participants as a primary reference point for valuing NYMEX WTI crude oil futures contract prices. Defendants' multiple manipulations of NYMEX WTI crude oil prices sent false signals to and greatly misled market participants in not only the WTI physical markets but also in the NYMEX WTI crude oil futures market as well.

(c)    Defendants focused their derivatives trading and manipulation in the February 2008 - June 2008 NYMEX WTI crude oil futures contracts. However, the operation of arbitrage between and among the prices of different NYMEX expiration month prices distributed Defendants' artificial effect on prices to later NYMEX WTI crude oil futures contracts as well.  Thus, Defendants had to do enough to manipulate artificially other NYMEX contracts in order to manipulate the February 2008 - June 2008 NYMEX contracts on which Defendants focused their manipulation.

(d)    A specific, necessary and intended effect of Defendants' manipulation was to cause the settlement prices of the February 2008 - June 2008 NYMEX WTI crude oil futures contract to be manipulated.

(e)    The operations of the NYMEX rules and the NYMEX Settlement Committee further distributed the artificial settlement prices caused by Defendants to the settlement prices and the trading prices of other NYMEX WTI crude oil futures contracts expiring after June 2008.

(f)    Through the foregoing and other artificial effects on NYMEX WTI crude oil

4

927128.1

futures contracts, Defendants' manipulations and unlawful conduct thoroughly deprived Plaintiff and members of the Class during the Class Period of a lawfully operating market for NYMEX WTI crude oil futures contracts.

6.    As a direct and foreseeable result of Defendants' manipulation, Plaintiff and members of the Class transacted NYMEX WTI crude oil futures contracts at artificial prices and were deprived of a lawful market during the Class Period. For one example, while transacting at artificial prices in a manipulated market in the June 2008 NYMEX WTI crude oil futures contract, Plaintiff suffered net losses on his NYMEX WTI crude oil futures contract transactions made during the Class Period.

## JURISDICTION AND VENUE

7.    Crude oil is a "commodity" and is the "commodity underlying" the WTI crude oil futures contracts traded on the NYMEX, as those terms are defined and used in Sections 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

8.    The Court has jurisdiction over this action pursuant to 7 U.S.C. §25 and 28 U.S.C. §§1331 and 1337.

9.    Venue is proper in the Southern District of New York pursuant to 7 U.S.C. §25(c), 15 U.S.C. §22 and 28 U.S.C. §1391(b), (c), and (d). NYMEX WTI crude oil futures contracts were traded during the Class Period in this District on the NYMEX, which is located at One North End Avenue, New York, New York, and the manipulated prices occurred in this District. Further, the Defendants transact business in the Southern District of New York. The claims arose in the Southern District of New York, and/or a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

10.    Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in the connection with the unlawful acts and practices and courses of business alleged in this Complaint.

927128.1

## THE PARTIES

**Plaintiff**

11.    Plaintiff Christopher T. Courtiol is a resident of Boulder, Colorado. Plaintiff transacted in NYMEX WTI crude oil futures contracts and was injured by Defendants' conduct during the Class Period. Plaintiff bases his allegations on personal knowledge and on information,[1] including the investigation of counsel, and belief.

**Defendants**

12.    Defendant Parnon Energy Inc. is a corporation organized and existing under the laws of Texas with its principal place of business in Rancho Santa Fe, California. Defendant Parnon is a subsidiary of Parnon Holdings Inc., which is a wholly owned subsidiary of Farahead Holdings Ltd., and is an affiliate of Arcadia Petroleum Ltd. and Arcadia Energy (Suisse) SA. Defendant Parnon operates as a common enterprise with Arcadia Petroleum, Ltd. and Arcadia Energy (Suisse) SA. Defendant Parnon's agents and employees buy and sell WTI physical and WTI derivative positions for profit, speculating on WTI price movements. Defendant Parnon has never owned or operated an oil refinery and is not an end user of crude oil.

13.    Defendant Arcadia Petroleum Ltd. is a corporation organized and existing under the laws of the United Kingdom with its office and principal place of business in London, England. Arcadia Petroleum is a wholly owned subsidiary of Farahead Holdings Ltd. Arcadia Petroleum is engaged in the business of trading crude oil, crude oil products and oil derivatives for profit in various physical and financial markets throughout the world. During the relevant period Arcadia Petroleum officers in London supervised the WTI group's trading and the financing of its trades, and its officers and employees handled the risk management, compliance, credit, financing, mid-office and back-office functions for Parnon and Arcadia Suisse, which did not have such personnel. One single individual was the CEO and

---

[1] Plaintiff's information also includes the allegations in the related case *U.S. Commodity Futures Trading Commission v. Parnon Energy Inc, et al.,* 11-cv-03543 (WHP) (S.D.N.Y.); the prices for WTI crude oil; the prices for NYMEX WTI crude oil futures contracts; and the NYMEX rules.

927128.1

head trader of Arcadia Petroleum, and performed the functions of CEO for Parnon and Arcadia Suisse. Defendants Wildgoose, Dyer, and the other crude oil traders reported to this individual.

14.    Defendant Arcadia Energy (Suisse) SA is a corporation organized and existing under the laws of Switzerland with its office and principal place of business located in Morges, Switzerland. Arcadia Suisse is a wholly owned subsidiary of Farahead Holdings Ltd. Arcadia Suisse is engaged in the business of trading crude oil derivatives for profit on various exchanges including NYMEX and ICE. During the relevant period an open, two-way communication line was maintained between the Parnon office in California and the Arcadia Suisse office in Switzerland, so that traders in one office could hear and participate in conversations among the traders at the other office. Parnon's WTI physical position and Arcadia Suisse's WTI crude oil derivatives position were described in daily position reports, which were transmitted via email to and reviewed by Dyer, Wildgoose and the CEO of Arcadia Petroleum.

15.    Defendant James T. Dyer is an individual residing in Brisbane, Australia. From approximately 2005 through at least 2008, Dyer was responsible for the strategy and trading in the Defendants' WTI crude oil book. In 2007, in the process of setting up a U.S. trading arm for Arcadia Petroleum, Dyer traveled to the U.S. to meet with and recruit Wildgoose and to negotiate with TEPPCO Partners Inc. on behalf of Arcadia Petroleum for the building of storage tanks that would demonstrate to the market Arcadia Petroleum's ability to store large quantities of physical oil. Dyer acted on behalf of and as agent for Defendants Parnon/Arcadia and was authorized to direct the trading of WTI physical and WTI derivatives on behalf of Parnon/Arcadia. In 2008, Dyer earned a base salary and was eligible for and received a bonus based upon the profitability of the WTI book.

16.    (a)    Defendant Nicholas J. Wildgoose is an individual residing in Rancho Santa Fe, California. During the relevant period Wildgoose, a crude oil trader, was jointly responsible with Dyer for the strategy and trading in the WTI book. Wildgoose acted on behalf of and as an agent for Parnon/ Arcadia and was authorized to direct the trading of WTI physical and WTI derivatives on behalf of Parnon/Arcadia. Wildgoose received a base salary and was eligible for and received bonuses based upon the profitability of the WTI book.

7

(b)    John Doe Defendants "1" — "10" are persons who worked with Defendants or on whose behalf Defendants worked to manipulate prices.

## BACKGROUND

### The Commodity Futures Market

17.    A person may act as a futures contract exchange or board of trade only if that person is approved and designated to do so by the CFTC. The CFTC approves such a designation only if the proposed exchange sufficiently demonstrates (a) that it has rules, such as position limit rules, to prevent price manipulation, and (b) that it has procedures to enforce such anti-manipulation rules.

18.    The NYMEX is designated by the CFTC as a board of trade. NYMEX is the world's largest physical commodity futures exchange.

19.    The NYMEX applies to the CFTC for permission to trade each commodity in which the NYMEX offers a contract. The NYMEX must establish, among other things, that the proposed contract is not prone to price manipulation in order to win approval to trade such contract. NYMEX members and clearing members have to follow the rules of the NYMEX. This includes the most important rules: the rules prohibiting manipulation.

20.    Also, commodity futures professionals licensed as associated persons, futures commissions merchants, commodity trading advisors, and commodity pool operators are required to be familiar with CFTC and exchange requirements. This includes the most important requirements, those prohibiting price manipulations.

21.    A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity.  In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

22.    The "bilateral" aspect of the futures contract is that there is a seller and buyer.

23.    The sellers are one-half of the bilateral futures contract and one-half of the commodity futures market. They are referred to as "shorts."

24.     The buyers are the other one-half, and are referred to as "longs."

25.     One of the many differences between stock and commodity futures trading is that the commodity exchange (here, the NYMEX) publishes the amount of the open interest of "longs" and "shorts" at the end of each trading day.

26.     Open interest is defined as the total number of futures contracts in a delivery month or market that has been entered into and not yet offset or cancelled. Each open transaction has a buyer (a long) and a seller (a short).

27.     All things being equal, buying pressure in a commodity futures contract (or the commodity underlying such contract) will increase prices and selling pressure will decrease prices.

28.     Because the prices are publicly reported, the increased or decreased prices resulting from buying pressure or selling pressure may encourage others to act accordingly. For example, buying pressure may increase prices and induce members of the public to buy as well.

**NYMEX WTI Crude Oil Futures**

29.     Futures. One of the futures contracts created by the NYMEX and approved by the CFTC is the NYMEX light sweet crude oil (WTI) futures contract.

30.     NYMEX light sweet crude oil (WTI) futures contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms and also through open outcry at the NYMEX in New York. Globex is an electronic trading platform owned by the NYMEX's parent company, the CME Group. Open outcry is a method of public auction for making bids and offers in the trading pits of futures exchanges.

31.     The size of a NYMEX WTI crude oil futures contract is 1,000 barrels.

32.     NYMEX WTI crude oil futures contracts call for settlement by physical delivery at a variety of pipelines or storage facilities in Cushing, Oklahoma.

33.     During each calendar month (the "current calendar month"), the Exchange will make available for trading contracts that provide for delivery of WTI crude oil in (a) consecutive months for

9

the current year and next five years and (b) the June and December contract months for six through nine years forward.

34.    Trading in NYMEX WTI crude oil futures contracts terminates on the third business day prior to the twenty-fifth calendar day of the month preceding the delivery month.

35.    Daily settlement prices of NYMEX WTI crude oil futures are settled at the volume-weighted average price ("VWAP") of all trades occurring on Globex between 2:28 and 2:30 Eastern Standard Time. The daily settlement prices of the second through sixth contract months are determined based on Globex spread data. All other contract months are settled by NYMEX staff, in consultation with market participants, based upon traded/quoted spread relationships.

36.    Trading in NYMEX WTI crude oil futures contracts is subject to the rules and regulations of the NYMEX, and prices are quoted in U.S. dollars and cents per barrel.

37.    Calendar Spreads. A so-called "calendar spread" in NYMEX WTI crude oil futures contracts is a position in two consecutive futures contracts. For example, if a market participant held a long February/March 2008 calendar spread in NYMEX WTI crude oil futures contracts, the market participant would be long the February 2008 NYMEX WTI crude oil futures contract and short the March 2008 NYMEX WTI crude oil futures contract and hope to profit by having the February 2008 NYMEX WTI crude oil futures contract increase in price relative to the March 2008 NYMEX WTI crude oil futures contract. If a market participant was short the same calendar spread in the foregoing example, such market participant would be short the February 2008 NYMEX WTI crude oil futures contract and long the March 2008 NYMEX WTI crude oil futures contract and hope to profit by having the February 2008 NYMEX WTI crude oil futures contract decrease in price relative to the March 2008 NYMEX WTI crude oil futures contract.

**IntercontinentalExchange ("ICE")**

38.    IntercontinentalExchange ("ICE") is a London-based derivatives exchange. ICE offers trading in the same WTI crude oil futures contracts as NYMEX. However, ICE WTI crude oil

derivatives are financially settled to the price of the corresponding NYMEX WTI crude oil futures contract.

**The Cash Market For WTI Crude Oil**

39.    The crude oil marketing hub in Cushing, Oklahoma is the most significant marketing and trading hub for crude oil in North America. Cushing serves as the delivery point for light sweet crude oil futures contracts traded on the NYMEX.

40.    WTI crude oil is one of the most actively traded domestic crude oils and is the U.S. benchmark grade and the primary deliverable grade under the NYMEX WTI crude oil futures contracts.

41.    Physical WTI crude oil for delivery at Cushing in the near month is traded until the end of the third business day following the expiration of the NYMEX WTI crude oil near month futures contract. The three-day period after the near month futures contract expiry is known as the "cash window."

42.    Most commercial users of crude oil complete their purchases and/or sales of physical oil needed for the following month before the cash window opens. Thus, trading in the cash window is an indicator to market participants of the next month end-of-month balances of Cushing oil stocks, which in turn impacts the prices of NYMEX WTI crude oil futures contracts.

<u>SUBSTANTIVE ALLEGATIONS</u>

**Defendants' Manipulative Scheme**

43.    In or around September 2007, Defendant Dyer sent an e-mail to other traders that worked for Defendants and explained that there was a "shitload of money to be made shorting" NYMEX WTI crude oil calendar spreads (*see* above defining a calendar spread) *if* two conditions were met: (1) the market would have to believe that crude oil supplies at Cushing were tight (*i.e.*, supplies were low) and (2) someone would have to unexpectedly turn the end-of-month balance into a "surplus."

44.    As more fully set forth below, Defendants executed their alleged manipulative scheme multiple times throughout the Class Period including in January, March and April 2008.

11

927128.1

**January 2008**

45.    Manipulative Step 1. Between January 3 and January 10, 2008, Defendants purchased a large long calendar spread position of 13,600 February/March 2008 WTI crude oil futures contracts. That is, Defendants purchased long positions in February 2008 NYMEX WTI crude oil futures contracts and short positions in March 2008 NYMEX WTI crude oil futures contracts.

46.    Manipulative Step 2. (a) After establishing most of their long calendar spread position, Defendants began, between approximately January 8 and continuing until January 18, 2008, to purchase a total of approximately 4.6 million barrels of physical February 2008 WTI crude oil. These purchases constituted approximately 66% of Defendants' own estimate of a 7 million barrel end-of-month available WTI crude oil balance.

(b)    Defendants' large purchases of physical WTI crude oil referenced above caused Defendants' long positions in February/March 2008 NYMEX WTI crude oil futures to increase in price. For example, on January 3, 2008, when Defendants began to buy their long spread positions, the February/March NYMEX WTI crude oil futures spread price closed at $0.24. But by January 18, 2008 (when Defendants had finished purchasing large amounts of physical WTI), the February/March NYMEX WTI crude oil futures spread price had increased by more than 170% to $0.65.

(c)    Defendants did not sell their foregoing dominant position through January 22, the expiration day for the February 2008 NYMEX WTI crude oil futures contract.

(d)    Defendants' refusal to sell their large physical WTI position prior to expiration of the near month futures contract was uneconomic, absent a manipulation, because Defendants had no commercial need for WTI crude oil. Moreover, Defendants knew that selling such a large position during the cash window would result in substantial losses (absent a manipulation).

(e)    Defendants sold back (liquidated) their long February/March spread positions at the artificially inflated prices that they had caused.

47.    Manipulative Step 3. On January 23, 2008, the first day of the cash window, Defendants still held almost all of their large physical WTI position. As set forth above, most commercial users of

12

crude oil complete their purchases and/or sales of physical oil needed for the following month before the cash window opens. Between January 22, 2008 and January 25, 2008, Defendants increased their large short position in the March/April 2008 calendar spread from approximately 5.8 million barrels to approximately 12.2 million barrels. The foregoing short positions were established at the artificially high prices that Defendants' large purchases of physical WTI had caused.

48.    Manipulative Step No. 4. (a) After having led the market to believe that supply would remain tight and after having established their large short positions at the artificially high prices they had caused, Defendants began what Defendant Wildgoose referred to as the "inevitable puking" of Defendants' WTI physical position. That is, Defendants began to sell such unneeded physical position.

(b)    Accordingly, on January 25, the final day of the cash window, Defendants dumped approximately 4.6 million barrels of physical WTI crude oil deliverable in February.

(c)    Defendants' foregoing large sales caused the cash/futures market to move from backwardation (i.e., a market condition wherein the price of a futures contract is trading below the present cash or spot price) to contango (i.e., a market condition wherein the futures price is above the present cash or spot price) as the February WTI cash price dropped to $0.32 below the March futures price, a drop of $0.97 in the February WTI cash price.

(d)    A market move from backwardation to contango on the last day of the cash window only happened twice between January 2006 and January 2011. Both of these times occurred as a result of Defendants' manipulative scheme alleged herein.

**March 2008**

49.    Defendants intended to repeat the manipulative scheme in February 2008 and did have effects on prices then. In March 2008, Defendants repeated the same manipulative scheme they had successfully executed in January 2008.

13

50.    Manipulative Step 1. Between February 27 and March 13, 2008, Defendants increased their long position in NYMEX WTI crude oil April/May calendar spread futures and derivatives to approximately 14.4 million barrels.

51.    Manipulative Step 2. (a) Between March 4 and March 19, 2008, Defendants acquired a dominant position of 6.3 million barrels of physical WTI—approximately 84% of the 7.5 million barrel end-of-month balance that Defendants had predicted.

(b)    Defendants' large purchases of physical WTI resulted in artificially high prices of the April/May 2008 calendar spreads. For example, on March 4, 2008 the price of the April/May spread was 55 cents. However, by March 14, 2008, the April/May spread price had increased by almost 300% to $1.47.

(c)    Between March 14 and March 19, 2008, Defendants sold their entire foregoing April/May calendar spread position at the artificially high prices that their large purchases of physical WTI had caused.

52.    Manipulative Step 3. On March 20, 2008, the first day of the cash window, Defendants still un-commercially held almost all of their large physical WTI position. Prior to March 20, 2008, Defendants had established a short position in the May/June 2008 calendar spread of approximately 13.5 million barrels. On March 20, 2008, the first day of the cash window, Defendants (before they dumped their physical position), increased their short position to approximately 19 million barrels. On March 24, the second day of the cash window, Defendants again increased their May/June short position to approximately 21.5 million barrels.

53.    Manipulative Step 4. (a) On March 23, 2008, Defendant Wildgoose said he planned to "sell hard tomorrow starting first thing" and that he expected prices would be "much lower on the final day of cash." Accordingly, on March 24, 2008 (the last day of the cash window), Defendants dumped approximately 4.6 million of their 6.3 million barrel physical WTI position.

(b)    Defendants' large sales during the cash window caused the May/June 2008 spread price to drop 50%—from $0.78 on March 20 to almost $0.39 on March 25.

14

(c)    Similar to January, Defendants' foregoing conduct resulted in the market moving from backwardation to contango on March 25, 2008 (the last day of the cash window).

**April 2008**

54.    In April 2008, Defendants again repeated the same manipulative scheme they had executed in January and March.

55.    In early April 2008, Defendants again established a substantial long May/June WTI futures position equal to approximately 16 million barrels and also acquired a substantial long position in physical WTI crude oil (nearly 8 million barrels for May delivery).

56.    After Defendants' first two manipulative steps had artificially inflated the level of May and June NYMEX WTI crude oil futures contract prices and artificially widened spreads, Defendants learned on or about April 17, 2008 that the CFTC was investigating Defendants' manipulative activities. With this knowledge, Defendants did not execute the sales portion of their manipulation as they had done in January and March. Instead, Defendants diversified their WTI physical crude oil activities, including storing approximately 2.5 million barrels until after the cash window had closed. Thereafter, the price artificiality in NYMEX WTI crude oil futures that Defendants had caused gradually subsided until after the times in May 2008 when Defendants released their manipulative holding of the 2.5 million barrels of WTI crude oil to the market.

**Defendants' Manipulative Profits**

57.    Although Defendants' uneconomic conduct of selling physical WTI crude oil for a loss during the cash window resulted in a loss of over $15,000,000.00, such uneconomic conduct also resulted in profits of over $50,000,000 in Defendants' NYMEX WTI crude oil futures positions.

<u>**CLASS ALLEGATIONS**</u>

58.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on his own behalf and as a representative of a class defined as:

927128.1

All persons or entities that purchased and/or sold during the period from at least late 2007 through at least April 2008 ("Class Period") a light sweet crude oil (WTI) futures contract traded on the NYMEX ("Class"). Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.

59.    The Class is so numerous that joinder of all members is impracticable. Due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States. The number and identity of Class members is unknown to the Plaintiff, but can be ascertained from readily available information. Plaintiff believes that there are hundreds or perhaps thousands or more members of the Class.

60.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

A.    whether Defendants manipulated NYMEX WTI crude oil futures contracts in violation of the CEA;

B.    whether such manipulation caused NYMEX WTI crude oil futures contracts to be artificial;

C.    whether such manipulation caused cognizable legal injury under the CEA;

D.    whether such injury or the extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests; and

E.    the operative time period and extent of Defendants' violations.

61.    Plaintiff's claims are typical of the other members of the Class he seeks to represent. The Plaintiff and members of the Class were injured by the same course of manipulative conduct and make the same legal claim.

62.    Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff has retained counsel experienced in commodity futures manipulation class actions. Plaintiff has no interests which are adverse to or in conflict with other members of the Class.

63.    The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

64.    A class action is superior to other available methods (if any) for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

65.    The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The damages suffered by the individual Class members may be relatively small; and therefore, the expense and burden of individual litigation make it virtually impossible for them to redress the wrongs done to them. Plaintiff anticipates no difficulty in the management of this action as a class action.

## INJURY TO PLAINTIFF AND MEMBERS OF THE CLASS

66.    During the Class Period, Plaintiff and the other members of the Class transacted NYMEX WTI crude oil futures contracts at artificial prices and were deprived of a lawfully operating market. Further, by reason of the alleged extensive violations of the CEA, Plaintiff and the other members of the Class paid prices that were not what they would have paid in the absence of the extensive unlawful conduct. As a result, Plaintiff and all members of the Class have suffered a legally cognizable injury due to Defendants' violations.

927128.1

67.    The specific amounts of actual damages under the CEA have not yet been determined because such determination will require discovery of Defendants' conduct, the NYMEX, as well as non-parties.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

68.    By its very nature, the unlawful activity alleged herein that Defendants engaged in was self-concealing.

69.    Plaintiff neither knew, nor, in the exercise of reasonable diligence, could have known of the violations on which his claims are based until approximately three and one-half years after the violations alleged herein began.

70.    The running of any statutes of limitations has been suspended with respect to any claims which Plaintiff and other members of the Class have. This is by virtue of the federal doctrines of fraudulent concealment and equitable tolling. As a result, all statutes of limitations otherwise applicable to the allegations herein have been tolled until May 24, 2011 (*i.e.*, the date of the CFTC Complaint against Defendants).

## COUNT I

### AGAINST ALL DEFENDANTS

**(Manipulation In Violation Of The Commodity Exchange Act, 7 U.S.C. §1, *et seq.*)**

71.    Plaintiff incorporates by reference the allegations above as if fully set forth herein.

72.    Plaintiff and members of the Class purchased and/or sold one or more NYMEX WTI crude oil futures contracts during the Class Period and were injured as a result of Defendants' manipulation of the prices of those contracts in violation of the CEA, 7 U.S.C. §1, *et seq.*

73.    Defendants' undisclosed conduct and trading activity alleged herein constituted a manipulation of NYMEX WTI crude oil futures contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

927128.1

74.    As result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered damage due to artificial prices to which they would not have been subject but for the unlawful conduct of Defendants as alleged herein.

75.    Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

### COUNT II

### AGAINST DEFENDANTS PARNON ENERGY INC., ARCADIA PETROLEUM LTD, AND ARCADIA ENERGY (SUISSE) SA

#### (Principal-Agent Liability In Violation Of The Commodity Exchange Act 7 U.S.C. §1, *et seq.*)

76.    Plaintiff incorporates by reference the allegations above as if fully set forth herein.

77.    Defendant Dyer acted on behalf of and as agent for Defendants Parnon Energy Inc., Arcadia Petroleum LTD, and Arcadia Energy (Suisse) SA and, as agent or other person acting on behalf of the foregoing Defendants, engaged in the manipulative scheme alleged herein on their behalf and with their authorization.

78.    Defendant Wildgoose acted on behalf of and as agent for Defendants Parnon Energy Inc., Arcadia Petroleum LTD, and Arcadia Energy (Suisse) SA and, as agent or other person acting on behalf of the foregoing Defendants, engaged in the manipulative scheme alleged herein on their behalf and with their authorization.

79.    Defendants Parnon Energy Inc., Arcadia Petroleum LTD, and Arcadia Energy (Suisse) SA paid for the manipulative trades that were part of the manipulative scheme alleged herein.

80.    Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B), each of the aforementioned Defendants is liable for the acts of its agents.

81.    Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

927128.1

<u>COUNT III</u>

**AGAINST ALL DEFENDANTS**

**(Aiding and Abetting Liability In Violation Of The Commodity Exchange Act,
7 U.S.C. §1, *et seq.*)**

82.     Plaintiff incorporates by reference the allegations above as if fully set forth herein.

83.     Defendants each played their component role and each knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.

84.     Under Section 13c(a) of the CEA, 7 U.S.C. §13, Defendants are liable for willfully intending to assist the manipulation.

85.     Plaintiff and members of the Class are each entitled to damages for the violations alleged herein.

**<u>RELIEF REQUESTED</u>**

WHEREFORE, the Plaintiff requests the following relief:

A.  For a declaratory judgment that all Defendants manipulated NYMEX WTI crude oil futures prices in violation of the CEA Section 9(a), 7 U.S.C. Section 13(b);

B.  For a declaratory judgment that Defendants Parnon Energy Inc., Arcadia Petroleum LTD, and Arcadia Energy (Suisse) SA are liable for the acts of Defendants Dyer and Wildgoose pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B);

C.  For a declaratory judgment that Defendants aided and abetted the manipulation alleged herein in violation of Section 13c(a) of the CEA, 7 U.S.C. Section 13;

D.  For an order certifying the CEA claims as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiff as a Class representative and his counsel as Class Counsel;

927128.1

E.  For a judgment awarding the Plaintiff and the Class damages against Defendants for Defendants' violations of the CEA together with prejudgment interest at the maximum rate allowable by law;

F.  For an award to Plaintiff and the Class for their costs of suit, including reasonable attorneys' fees and expert fees and expenses; and

G.  For such other and further relief as the Court may deem just and proper.

21

## DEMAND FOR JURY

Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiff respectfully demands a trial by jury.

Dated:  June 23, 2011
      New York, New York

Respectfully submitted,

*Nicholas Diamand*

Nicholas Diamand

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Nicholas Diamand (ND 9701)
250 Hudson Street, 8th Floor
New York, NY  10013-1413
212.355.9500
ndiamand@lchb.com


Merrill G. Davidoff
Eric L. Cramer
**BERGER & MONTAGUE, P.C.**
1622 Locust St.
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
mdavidoff@bm.net
ecramer@bm.net

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Joseph R. Saveri
Eric B. Fastiff
Brendan Glackin (BG 7314)
275 Battery St., Suite 3000
San Francisco, CA 94111-3339
Tel: (415) 956-1000
Fax: (415) 956-1008
jsaveri@lchb.com
bglackin@lchb.com

*Counsel for Plaintiff and the Proposed Class*

927128.1